NATIONAL CARBON CO., Inc., v. RICHARDS & CO., Inc., et al.

No. 2316.

District Court, D. Connecticut.

April 27, 1935.

Watson, Bristol, Johnson & Leavenworth, of New York City (Leonard A. Watson and Clair V. Johnson, both of New York City, of counsel), and Parmelee & Thompson, of New Haven, Conn., for plaintiff.

Gifford, Scull & Burgess, of New York City (Newton A. Burgess, of New York City, of counsel), for defendants.

HINCKS, District Judge.

This is a bill in equity brought by a New York corporation against Richards & Company, Inc., a Connecticut corporation, and its successor in business, the Zapon Company, a New Jersey corporation, having a regular and established place of business in Connecticut, alleging the infringement within Connecticut of United States patents Nos. 1,497,543 and 1,497,544, issued June 10, 1924, covering improvements in absorptive carbon and the process of making the same.

The defendants duly appeared and answered the bill, denying most of the essential allegations thereof. Thereafter the defendants appeared in opposition to the plaintiff's motion for a further statement of the nature of the defense and filed objections to plaintiff's interrogatories which were ruled upon. Thereafter, when the case came on for trial upon the merits, the plaintiff offered evidence upon the issues of validity and infringement, and the defendants offered no evidence upon said issues. Accordingly, the court proceeded, forthwith and by successive adjournments, to take evidence upon the issues raised by plaintiff's prayer for an accounting of the defendants' profits and damages under the statute.

## Finding of Facts.

The defendants successively have owned and operated a plant in Stamford, Conn., for the manufacture of pyroxylin-coated fabrics and lacquers from 1922 until June 30, 1934. Their product is a coated fabric or artificial leather made by the application to a fabric base of a "dope" containing a mixture of solvents, pigments, and other materials. The dope thus applied to the base is then dried by evaporating out the solvent elements. Since, however, the cost of the solvents is a very considerable item in the cost of manufacture, one of the principal problems of the business is to recover the solvents that are evaporated from the drying dope so that the recaptured solvents may be available for use in the preparation of fresh dope, in successive cycles in the progress of manufacture. To accomplish this task of solvent recovery, pri-

or to June 1, 1930, the defendants had used a solvent recovery plant, installed in 1921, whereby the solvent vapors, evaporating from the dope as it was applied, in mixture with the air were in part recovered by condensation on coils, the residue of the recovery being accomplished by stripping the solvent vapors from the air by the use of creosote oil to which live steam was then applied, producing a liquid solvent mixture which, as well as the solvent recovered by condensation (page 369), was then run through a still where by rectification the recovery process was completed.

By 1930, however, the defendants' apparatus for the recovery of solvent by the condensation-creosote oil method had become dilapidated and inefficient, largely because the condensation coils had become plugged with rust, and on June 1, 1930, the defendants installed a carbon recovery system.

By the carbon recovery system the mixture of solvent vapor and air in the coating machine was first cooled and then passed through a carbon absorber until the carbon therein was substantially saturated with solvent vapor. The absorber thus saturated was then blown out with steam and the product then passed through a condenser, a separating device and still in which by rectification the solvents were reduced to commercial form. The plant installed by the defendants had three such carbon absorbers, so arranged that while one absorber was in process of being charged, another might be blown out, thus effecting a continuity in the recovery of the solvents.

■ The carbon which the defendants used in said absorbers from June 1, 1930, to June 30, 1934, was a highly active cocoanut shell carbon known as "60-minute absorbite," made by the Barnebey Chaney Engineering Company. The use by the defendants of said carbon constituted an infringement of claims 14 and 17 of patent No. 1,497,543; and of claims 9 and 11 of patent No. 1,497,544. Said patents, issued on June 10, 1924, to Newcomb K. Chaney, were duly assigned to the plaintiff and were wholly owned by it during the entire period of the infringement.

The plaintiff has suffered damage from said infringement, but such damages are not susceptible of calculation and determination with reasonable certainty. Indeed, because of the impossibility of such a determination, the plaintiff claimed nothing by way of damages.

The plaintiff does claim, however, an award of a reasonable royalty under the statute, 35 U.S.C.A. § 70, and an accounting of the defendants' profits resulting from the infringement.

■ The defendants do not dispute that some profit was attained through their use of their entire carbon recovery plant. Indeed, Defendants' Exhibit A shows a profit of some $38,000 on the basis of the entire infringing period, and a profit of almost $51,000 if the loss of the unprofitable year 1932 be excluded from the computation. But they point out, and I find it to be the fact, that they used the infringing carbon only as one step in the continuous process of solvent-recovery. And plaintiff's patents do not cover the other steps in the process of solvent recovery nor any of the apparatus employed. The devices and means used to convey the solvent vapors to the carbon absorbers, to extract the absorbed vapors from the carbon, and thereafter by rectification and other means to separate the vapors and reduce them to liquid form suitable for commercial use, all were items outside the scope of the patents in suit. Indeed, it is the claim of the defendants that the extraction of the vapors from the saturated carbon by the application of steam was a process covered by the Engelhardt patent, which was received in evidence. On this account the defendants maintain that the plaintiff's recovery must be restricted to the limited advantage which they derived in using the patented carbon to absorb the solvent vapors, which was the only item of infringement proven. They argue that if the plaintiff is allowed recovery for the advantages which they derived from the entire carbon-recovery system, the effect is to compel them to pay tribute to the plaintiff for their use of apparatus and processes which either were old in the art or were the subject-matter of patents owned by others, as, for instance, Engelhardt. To allow plaintiff such a recovery, it is urged, subjects the defendants to a double liability, in that if the plaintiff, due to the use of its patented carbon, may recover the entire savings derived by the defendants from their carbon recovery system, equally Engelhardt, or his assignees, will be entitled to the same recovery by reason of the defendants' use of his patented process for extracting the solvent from the saturated carbon by steam. In other words, it is the claim of the defendants that the plaintiff's recovery must

be limited to the defendants' profit or saving from its use of the patented carbon as distinguished from the defendants' saving from the entire recovery system, and that the burden of proof is upon the plaintiff, by apportionment or otherwise, to show the savings to the defendants from the use of the patented carbon alone.

The argument, though plausible, is specious. Equity cannot admit that one who infringes one patent may escape liability therefor by infringing other patents· as well, and by so combining the original with the additional infringements that each is an indispensable element in the combined result. Here the activated carbon is an indispensable feature of the defendants' recovery system. The utility of the entire system is attributable to the patented carbon. The very fact that the defendants in the accounting proceedings suggested as standards of comparison not a specific device or material performing the limited function of the carbon used in their infringing plant, but rather combination machines and processes in which no specific part or material was functionally comparable with the infringing carbon, is in the nature of an admission that for a recovery plant such as the defendants', the patented carbon was an indispensable feature, for which even the defendants themselves knew no substitute. Thus, although the use of the patented carbon is but one step in the defendants' process, its position in the process is one of dominance. Without the carbon, the remainder of the defendants' recovery plant would be inoperable and wholly lacking in utility. And if the same is true of other elements in the infringing combination, it goes only to show, and indeed I so find, that the defendants have not only infringed, but have also inextricably confused their conduct in infringement of plaintiff's patents with their conduct in other respects and in other relations.

The foregoing facts, I hold, bring the plaintiff's case within rule (d) stated in the opinion in the case of Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, at page 614, 32 S. Ct. 691, 694, 56 L.Ed. 1222, 41 L.R.A.(N. S.) 653. To be sure, it has not given evidence "tending to separate or apportion the defendant's profits * * * between the patented feature and the unpatented features," but it has brought itself within the alternative branch of the rule and shown by "reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." In other words, the plaintiff here has brought itself squarely within the rule stated in paragraph 4 at page 618 of 225 U.S., at page 695 of 32 S.Ct. of the opinion in the Westinghouse Case just cited. The case is within that rule because on the facts here, it is impossible to escape the finding that the defendants have "inextricably commingled and confused the parts composing" the entire fund, comprising the "inseparable profits," to use the language of the Westinghouse opinion. Although this holding is consistent with the doctrine of the Westinghouse Case, the facts of the case at bar more nearly resemble those in Philadelphia Rubber Works Co. v. United States Rubber Reclaiming Works (C.C.A.) 277 F. 171, 178. There the plaintiff was allowed recovery from the infringer for the total profits derived because "the entire commercial value of the rubber [in the production of which the patented process was but one step out of several] arises from the use of the patented process."

Although, on the proofs here that an apportionment is impossible, the plaintiff is entitled to defendants' entire profits from its infringing recovery system, the defendants are entitled to have those profits measured by a comparison with any other proper recovery system available when the infringing period began (June 1, 1930). Two such comparative systems have been suggested by the defendants, viz., (1) the Thompson machine, or (2) the condensation-creosote oil system theretofore used by them, so renovated as to have an efficiency equal to that actually experienced in the calendar year 1927.

The Thompson machine which has been in use by the Standard Textile Products Company, Thompson's employer, since 1926, is the subject of a patent issued to Thompson in 1928. The machine of this patent, according to the testimony of the patentee, is a combination coating machine and solvent recovery device; the recovery apparatus being contained within and constituting an integral part of the coating machine. The machine was not available on the market until 1933, when a manufacturer was licensed to manufacture and sell the machines. Since then two machines

have been sold. The list price of the machines was $15,000 to $20,000, graduated downward according to quantity. Prior to 1933, the machines were not available on the market except by special arrangement with the patentee, and necessarily no price had been set upon the same. But the inventor in these proceedings testified that after the issuance of his patent he was ready and willing to allow others to build and operate machines on arrangements satisfactory to him. What arrangements would have satisfied him does not appear. The recovery section of the Thompson machine would not be operable as a substitute for the carbon absorbers in the defendants' plant. There is no evidence that the recovery section of the apparatus, consisting of condenser units, coil, and piping, had ever been sold separately; but the inventor-witness did put a figure of $1,000 on the recovery section. The evidence, however, does not disclose whether this figure represents the cost of manufacture or a hypothetical sale price, nor am I satisfied that it represents more than a casual guess from the witness chair. All things considered, I hold that the Thompson machine is not a proper standard of comparison from which to ascertain the profits of the infringement.

It seems fair, however, in ascertaining the profits, to use as a measure the very system which was superseded by the infringing system. And if such a system is so used, it seems fair to gauge its performance, not by its diminished efficiency in its old age, but rather by its efficiency in its prime. The parties seem not to dispute that the system as it was in 1927 would be a fair standard of comparison. I so find.

But before turning to the comparison, I must first dispose of another disputed point. It is this: The infringement was spread over a period of forty-nine months from June 1, 1930, to June 30, 1934. For the calendar year 1932 the amount of solvent recovery by the infringing system was far less than for any other part of the infringing period. For that year, even on the plaintiff's figures, the defendants derived no profits but, on the contrary, a substantial loss from their recovery operations. The defendants therefore claim that the profits, if any, during the infringing period must be offset by the losses of 1932 within that period. The plaintiff, however, claims that it is entitled to all profits shown as attributable to the infringement accruing from June 1, 1930, to December 31, 1931, and from January 1, 1933, to June 30, 1934, without offset for the loss in 1932.

On this issue the plaintiff's contention is sustained. Doubtless in many cases of infringement by manufacture or sale it is not feasible to subdivide the infringing period. Expenditures made in one portion of the infringing period may not have borne fruit until a later portion. Here, however, the only charge and the only finding is one of infringement by use, and the evidence is such that it is entirely feasible to exclude from the infringing period the profit or loss of 1932 and ascertain the actual savings to the defendants resulting from the infringement during the remainder of the infringing period. The subdivision being feasible in the light of the evidence—that is to say, the available figures for 1932 being separately stated—it is clearly inequitable to allow the defendants to offset the advantage which they have actually derived for a part of the period by a loss not shown to be caused by the infringing material. It is well established that infringers are not entitled to have their profits from the infringement offset by losses in other activities or departments wholly separable from the infringement. By the same reasoning the defendants' actual profits during a part of the infringing period must measure the plaintiff's recovery without debit for losses sustained in the unprofitable part thereof.

The case of Merrell Soule Company v. Powdered Milk Company (C.C.A.) 7 F.(2d) 297, 298, does not support the defendants' contention on this point. In that case the master and the District Court refused to credit the infringing defendant with a business expense or cost which he actually sustained on the theory that he might so have conducted his business that the expense would have been less, thus "constructing an imaginary business for the defendant, and mulcting him in what he would have made had he embarked thereupon." The case holds only that profits to be a proper subject of award must be "actual not possible gains." With this requirement my ruling is wholly compatible. Even though the operations of 1932 are excluded from the computations, the award consists only of actual gains, and I must decline to abate the award merely because the defendants in 1932 had less opportunity to infringe than during the remainder of the period.

·Consequently, in the computations which will follow I shall confine my figures to the thirty-seven months of the infringing period which remain when the nonprofitable year of 1932 is excluded.

I turn now from law to mathematics. I find the defendants' savings actually obtained from the use of its infringing carbon recovery system for the thirty-seven months under consideration to be $38,353.36 as shown on: .

## SCHEDULE A

Savings to Defendants from Solvent Recovery (Measured by operations of the infringing recovery system)

| | | |
|---|---:|---:|
| Credit | | $179,510.94 |
| 560,774 gals. solvent recovered, @ $.3196 per gal. (these figures, taken from defendants' books are not disputed). | | |
| Debit | | |
| Cost of operations before fixed charges (this figure likewise not disputed). | $47,007.35 | |
| Depreciation at 10% on fixed charges of $173,205, applicable to solvent recovery, | 53,404.88 | |
| Pro rata taxes and insurance, | 8,702.42 | |
| Interest at 6% on $173,205, | 32,042.93 | |
| Total debits, | | $141,157.58 |
| Saving to defendants from solvent recovery, | | $38,353.36 |

■ With respect to the foregoing schedule, the parties are agreed that the gains to the defendants should be debited by a charge for depreciation of 10 per cent., and they are further agreed that the invested capital applicable to solvent recovery was at least $173,205. The defendants, however, claim that the amount of capital investment should be increased by a further credit of $50,000 expended in the renovation of their coating machines, on the theory that the expenditure was necessitated by the change from the old condensation-oil system to the carbon system. However, the defendants' own executive officers freely conceded that the expenditure had made a substantial increase in the efficiency of their coating machines, and from that viewpoint alone justified the expense (page 391). And the evidence throughout shows that the expenditure was no part of the process of solvent recovery. Consequently I have excluded this item as an element of the invested capital applicable to solvent recovery under the infringing system.

It may also be noted that the plaintiff claims that the credit for interest on invested capital should be limited to interest at 5 per cent. I find nothing in the record, however, to indicate a rate other than 6 per cent., which is the legal rate of interest in this state.

Against these figures, in order to ascertain defendants' profits from the infringement as distinguished from their savings from their recovery operations, we must offset the savings which the defendants would have effected during the same thirty-seven months of the infringing period by the use of their condensation-oil system at its 1927 efficiency, which is the selected standard of comparison. The evidence shows that these savings would have been as shown on:

## SCHEDULE B

Savings attainable by comparative system.

| | | | |
|---|---|---:|---:|
| Credit | | | |
| 386,007 gals. recovered @ $.3196, (not disputed) | | | $123,564.70 |
| Debit | | | |
| Item A: | Cost of operations before fixed charges, 386,007 gals. @ $.1119, | $43,194.18 | |
| | Depreciation at 10% on comparison system, investment of $104,205 (not disputed), | 32,129.88 | |
| Item B: | Depreciation at 10% on still investment, $18,000, | 5,550.00 | |
| Item C: | Pro rata taxes and insurance, | 6,140.00 | |
| | Interest @ 6% on total investment, including still, aggregating $122,205, | 22,607.93 | 109,621.99 |
| Savings attainable by Comparative System, | | | $ 13,942.71 |

■ Item A in the foregoing schedule is the product of the number of gallons of solvent which would have been recovered by the comparative system if operated at the capacity actually experienced during the 37-month infringing period. I understood that the defendants conceded that the amount of solvent which would thus have been recovered would be 386,007 gallons. In any event, the exhibits drawn from defendants' books amply establish that fact. The more difficult factor in the equation is the operating cost per gallon. To be sure, it was eventually proved (Exhibit 19) and, I think, conceded by the defendants, that the cost actually experienced by the defendants on their old recovery plant for the year 1927 was $.0929. But this was on the basis of the actual recovery for that year amounting to 226,443 gallons. The plaintiff contends, and the defendants concede, that this cost would have been somewhat

higher if the production were lower, as it actually was during the infringing period. The plaintiff's contention is that there is a fixed relation between operating cost and amount of production such that if production fell by, say 50 per cent., the operating cost would rise by 50 per cent. The suggestion is plausible, but I cannot find it proved. That being so, I am without power to give the plaintiff the benefit of a finding that the comparative operating cost exceeded $.1119 per gallon, that being the figure for which the defendants contended and which was established by the testimony of their own witnesses.

■ The plaintiff also claimed that the comparative cost figure should be increased by reason of the fact that the comparative system, especially in its condensation elements, would not operate with its 1927 efficiency if used to serve the coating machines which were installed in connection with the carbon recovery system. This contention must be denied for two reasons.

(1) As I already have held, the coating machines are not a part of the infringing process. That being so, the capital invested in the coating machines has been excluded from the computation of capital invested both in the infringing system and in the comparative system. Consequently, it is immaterial that the type of machine used with one system is not perfectly adapted for use with the other. For purposes of the comparison it must be assumed that the defendants would serve the comparative system with coating machines adapted for use with such a system.

(2) Although I find it proved that the coating machines actually used with the infringing system were such that the efficiency of the condensation elements of the comparative system would be substantially impaired, plaintiff has failed to prove the extent of that impairment. And, of course, I can substitute neither my guess nor the plaintiff's guess for evidence.

■ With respect to item B, above, I have little difficulty in finding that the comparative system should be debited with the sum of $5,550 to cover depreciation on still house and equipment. For the defendants conceded (page 465) that $7,569.72 was its own book value of the still house and equipment in 1930. But at that time the item stood 58 per cent. depreciated on the defendants' books (pages 151, 153, and 313). If its remaining value (after deducting a 58 per cent. depreciation) was $7,569.72, its cost must have been $18,000. And $5,550 would represent depreciation at 10 per cent. (which defendants themselves adopt as the proper rate generally, pages 154 and 155) for the infringing period of 37 months.

To be sure, the defendants contend that in the preceding item of "cost of operations before fixed charges," the per gallon cost figure of $.1119 was loaded sufficiently to include an allowance for depreciation on still. But it is agreed that the 1927 cost of operation, on a per gallon basis, was $.0929. And from an early stage in the hearings the defendants conceded that because of the decreased production actually experienced during the infringing period the per gallon cost would exceed that experienced in 1927, and defendants' own witnesses fixed the cost, when corrected for the decreased production, at $.1119 per gallon. This figure I have accepted as the basis of my award. It is therefore necessary to sift and weigh the evidence to determine whether there is merit in defendants' contention that the item sufficiently allows for depreciation on still house and equipment.

The figure of $.1119 as representing the per gallon cost under the comparative system first came into the record in Defendants' Exhibit B (page 142 et seq.) through the witness Wilson, assistant comptroller of the defendants, called by the defendants. Exhibit B shows an item "Cost of operation excluding fixed charges (depreciation, insurance and taxes) 494,322 (gals.) @ .1119, $55,314.63." It thus states in so many words that the cost item is exclusive of depreciation. And, indeed, other items in Exhibit B purport to state the depreciation. When asked how he derived the above-stated item of $55,314.63, Wilson testified he took the 1927 cost of operation (which was not then in evidence) and scaled it upward "on account of the lower production" experienced during the infringing period (page 145). Let it be noted that he did not then say that the figure included any allowance whatever for depreciation. On the contrary, he said (page 146) that it did "not include any allocation for fixed charges" and later showed that the Exhibit provided elsewhere for depreciation. The same witness when recalled (page 325) said this cost factor of $.1119 "includes a certain amount of repairs on the old system," and (page 326) "the ordinary repairs incidental to a plant is covered

246

by the rate 11.19"; but still he made no pretense that it included anything for depreciation. Whereupon the defendants rested.

Thus far, it must be remembered, no evidence showed how the figure of $.1119 was arrived at, and thus far plaintiff had nothing but the word of defendants' witness that the figure stated was in truth what it purported to be. In rebuttal, however, the plaintiff put into evidence (Exhibit 19) figures from defendants' books which showed that the true cost figure for 1927 was $.0929 per gallon. The defendants' operating manager, Creighton, who first testified that he collaborated with Wilson in fixing the comparative cost figure at $.1119, when asked in rebuttal (page 371) if Exhibit B included anything for depreciation on the still, admitted that it should, but denied knowledge whether it did. Whereupon defendants' counsel volunteered the information that Wilson would so testify (page 372). This is the first intimation that I find in the record that the previous testimony of defendants to the effect that the cost figure of $.1119 was "exclusive of fixed charges" was untrue or incorrect. Thereupon the defendants were allowed to reopen their case and recalled Wilson, who (page 399) said it did include depreciation on still, and on cross-examination (page 401) stated that in the figure of $.1119 there was an allowance of $.0032 "applicable for fixed charges for the rectification end."

But the defendants' books, which are reflected in Exhibit 19, show that the 1927 cost of $.0929 was an *operating* cost wholly without allowance for any fixed charges. If then, as defendants' witnesses belatedly claimed, the comparative cost figure of $.1119 includes anything for depreciation, it must be reflected in the differential of $.0190 between $.0929 (the 1927 cost) and $.1119 (the defendants' computation of the comparative cost). That such was the case seems incredible in the light of testimony just referred to. Nor is the defendants' claim corroborated by analysis of the data used by defendants' witnesses in the computation of the $.1119 figure. For the record shows that that figure was based on a comparative production during the infringing period of 494,322 gallons (Exhibit B). On this basis, the average twelve months' production would be 121,256 gallons. If the depreciation on still, now said to be included in the $.1119 figure to the extent of $.0032, is applied to that gallonage, it would indicate a figure of only $387.38 to represent the annual depreciation on the still which by computation (as above) from the defendants' books was an $18,000 item of investment. The gross inadequacy of the claimed allowance thus confirms my conviction that the cost factor of $.1119 shown for the comparative system was just what defendants' exhibits and testimony showed it to be, viz., an *operating* cost. That being so, the performance of the recovery system must be debited by the item of $5,550, above shown, for the depreciation on still.

The plaintiff has directed some criticism to the selection of the defendants' pre-infringing recovery system as the standard of comparison on the ground that its productive capacity was less than that of the infringing system. The objection would seem to be valid, if proved, but I am unable to find in the record reliable proof of the productive capacity of the pre-infringing system, or what capital investment would have been required for a condensation-oil system of equal capacity with the infringing system.

Nor am I able to find in the record sufficient evidence to support the plaintiff's claim for a reasonable royalty.

It follows, therefore, that the award must be limited to the defendants' saving in their recovery operations ($38,353.36) over and above what their savings would have been under the comparative system ($13,942.71). For the excess ($24,410.65) the plaintiff may have a final decree, which shall also embody an adjudication that claims 14 and 17 of patent No. 1,497,543, and claims 9 and 11 of patent No. 1,497,544 are valid and infringed.

The decree to be settled on notice, unless notice is waived.